## MORGAN v. CLEAR LAKE IRRIGATION & LUMBER CO. et al.

(District Court, D. Oregon. April 25, 1921.)

No. 8515.

Corporations ⬤�longrightarrow480½—Agreement held to effect equitable satisfaction of corporate trust deed.

A trust deed executed by a corporation to secure its bonds *held* to have become invalid by reason of transactions through which the present claimant of the bonds received the bonds of another corporation, which had succeeded to the property under an agreement that they were to be used in taking up the bonds of the first company for cancellation to relieve the property from their prior lien.

In Equity. Suit by David Morgan, trustee, against the Clear Lake Irrigation & Lumber Company and others. Decree for defendants, with order granting an injunction on the counterclaim of defendant Wapinitia Irrigation Company against defendant Joseph R. Keep.

Chester A. Sheppard and Fred Gronnert, both of Portland, Or., for complainant.

Harry G. Hoy, of Portland, Or., for defendant Wapinitia Irrigation Co.

Wood, Montague & Matthiessen, of Portland, Or., for defendant water users.

Ralph A. Coan, of Portland, Or., for defendant Keep.

WOLVERTON, District Judge. For some years prior to 1907 Joseph R. Keep had been engaged in acquiring water rights and privileges from the general government; also certain timber rights and licenses to cut the timber from public lands. In acquiring these rights and privileges, and in improving them with a view to their utilization, he expended considerable money, and beyond that became largely involved financially. For the purpose of more fully utilizing these properties and of organizing an irrigation project, Keep promoted the in-

corporation of what is known as the Clear Lake Irrigation & Lumber Company, hereinafter for convenience to be designated the Clear Lake Company. The capital stock was fixed at $500,000, divided into 5,000 shares, of $100 each. The articles of incorporation bear date October 24, 1907. Of this stock Keep subscribed 4,998 shares, and J. H. Kelly and J. M. Hanslmair each 1 share.

At a stockholders' meeting held November 9, 1907, Keep, having subscribed for all the stock except 2 shares, proposed in writing to pay for his stock by sale, conveyance, and transfer to the corporation of certain property more particularly described, as he asserts, "in a form of bill of sale and of deed inclosed herewith; said property being subject to an indebtedness for moneys actually advanced by me and by other parties for my account in the sum of about $146,000." It was further proposed that the company issue its first mortgage bonds in the sum of $300,000, in denominations of $500 each, and that it secure to Keep the payment of this indebtedness, first, by delivering to him $21,000 of these first mortgage bonds; and, second, $125,000 in preferred stock. The stockholders accepted his proposal. The bill of sale was made and delivered, comprising some sawmill properties, rights, machinery, tools, and equipments; but it is questionable whether the deed was ever executed or delivered—no record ever having been made of it in the proper recorder's office. Keep thinks it was, but the fact that he subsequently deeded the same properties to the corporation successor of the Clear Lake Company would seem to indicate that he is in error.

A trust deed to secure the issue and payment of $300,000 of the company bonds was in due time executed and delivered to the Portland Trust Company as trustee, and duly recorded. The affairs ran along until on March 7, 1911, a meeting of the stockholders was held, at which it was resolved to dissolve the corporation, dispose of its property, and wind up its business. In the meantime Keep claims that he expended $50,000 on account of the company.

At a meeting of the directors held March 17, 1911, on report of the president (Keep) that he was unable to dispose of the property and at his solicitation, the board entered a resolution whereby Keep was required to enter into a written agreement that he would pay all lawful debts of the company, aside from the bonds, not to exceed $94,000, on or before two years from date—a list of the creditors to be agreed upon between himself and J. L. Hartman: Provided, further, that Keep should cause the Eastern Irrigation, Power & Lumber Company to issue a series of $200,000 first mortgage bonds, of which series bonds to the amount of $94,000 should be placed in the hands of Hartman as trustee, to be held as additional security that Keep would pay such debts; in consideration whereof, the resolution further recites:

"This company hereby sells, assigns, and transfers to said Joseph R. Keep all bonds belonging to this company, and any and all such bonds which have been pledged as security for the payment of any debt which is to be paid by said Joseph R. Keep, shall, upon the payment of such debt, be delivered to and become the property of the said Joseph R. Keep."

It is claimed in behalf of plaintiff that by this resolution the Clear Lake Company sold to Keep all its outstanding bonds, being $150,000 in amount, and being all the bonds of the company that were ever issued and disposed of. On December 12, 1916, Keep assigned whatever interest he had in these bonds to Joseph C. Bayer. On December 21, 1918, the Portland Trust Company resigned its trust under the trust deed. February 12, 1920, Bayer and Keep, as purported owners of a large majority of the bonds, appointed David Morgan, of Seattle, Wash., trustee in the place and stead of the Portland Trust Company, and later, on March 16, 1920, Bayer assigned all his right, title, and interest in the bond issue to David Morgan.

Morgan, as such trustee, has instituted this suit to foreclose the trust deed, and to subject the property therein described to sale and application of the proceeds in payment of these bonds. It is conceded by counsel at the outset that Morgan does not occupy any more favorable position than Keep would, if he were suing. The initial controversy depends upon whether Keep has or can claim any such interest in these bonds as will entitle him to recover thereon, and to subject the property covered by the mortgage to their payment.

In the meantime, about February, 1911, the Eastern Irrigation, Power & Lumber Company was organized, with a capital stock of $50,000, divided into shares of $1 each. The stock was subscribed as follows: Joseph R. Keep, 49,950 shares; and N. W. Chapman, H. J. Keep, W. T. Houser, J. G. Garrow, and W. S. Chapman, each 10 shares. An assessment of 100 per cent. was made upon this stock. That being done, Keep proposed to sell and convey to the company all his land, land contracts, water, water power, water rights, timber, and timber rights, and all other rights, privileges, and permits owned or controlled by him in Wasco county, Or., more fully set forth in a deed then tendered, on condition that the company credit him with the payment of $49,950 and issue and deliver to him certificates of fully paid-up stock to the amount of 49,950 shares, and also issue and deliver to him promissory notes in the amount of $187,750, payable in two years, with 6 per cent. interest. The proposition was accepted by the Eastern Company, and its terms were complied with. It should be said in this connection that some of the other stockholders, with Keep's assistance, made rather a careful survey of the property involved, and placed a valuation upon it of $237,750, which equals the par value of the capital stock added to the amount of the notes given him.

The deed from Keep and wife, which was delivered to and accepted by the Eastern Company, covered all the property comprised by the Clear Lake Company's deed of trust to the Portland Trust Company, and in addition certain timber rights, and possibly other property rights and privileges. The Clear Lake Company also executed its deed to the Eastern Company, covering seven water rights which it had located subsequent to its organization, with a covering clause comprising "any other water rights, ditches, flumes situated in Wasco county, Oregon, not herein enumerated," and gave to it a bill of sale of the said mills, buildings, machinery, etc. These deeds and the bill of sale were executed on the 16th, 17th, and 20th of March, 1911.

On March 20, 1911, in pursuance of a proposition from Keep, the board of directors of the Eastern Company by resolution agreed to issue company bonds in the sum of $200,000 and deliver them to Keep, in consideration whereof Keep surrendered to the company the note issue of $187,750 and transferred to it 9,450 shares of its fully paid-up stock. The bonds were accordingly delivered to Keep. Subsequently a trust deed was given to J. C. Bayer as trustee, covering the property of the Eastern Company, to secure the payment of these bonds.

Prior to the time of Keep's coming into the possession of the Eastern Company bonds, he had hypothecated a large number of the Clear Lake Company bonds to secure indebtedness of his own and of the Clear Lake Company. None other than he seems to have used the Clear Lake Company bonds. There is no evidence that the company itself used them for sale on the market or otherwise, or for securing its own debts or obligations.

Mr. W. S. Chapman, who became a stockholder in the Eastern Company and had much to do in assisting Keep to promote its organization, had a firm understanding with Keep that he (Keep) should, on acquiring the Eastern Company's bonds, use them to take up and cancel and retire the Clear Lake bonds, which were then held by him or out as collateral to secure his creditors and those of the Clear Lake Company. Keep denies this, and the crucial issue arises whether it was the understanding on his part that the Clear Lake bonds should eventually be taken up and canceled, to relieve the holdings of the Eastern from any prior lien or incumbrance on account of the trust deed given by the Clear Lake Company to the Portland Trust Company.

By a resolution adopted by the board of directors, of date March 30, 1911, Keep was required to file with the secretary of the Eastern Company a written statement that he would protect all its property claims from the claims and creditors of the Clear Lake Company. In pursuance of this resolution, Keep made and subscribed his assurance as follows:

"This indenture witnesseth: That for one dollar, and other considerations, I, Joseph R. Keep, have agreed and do hereby agree to protect the Eastern Irrigation, Power & Lumber Company against all further claims of every one against the properties conveyed by me and by the Clear Lake Irrigation & Lumber Company to the said Eastern Irrigation, Power & Lumber Company in deeds filed for record in Wasco county, Oregon, as follows."

The deeds and bill of sale referred to are those executed on the 16th, 17th, and 20th of March, 1911.

The business continued until in the early spring of 1913, when Keep was arrested on a charge or charges preferred against him by the state, at which time the creditors of the Eastern Company became greatly exercised, and it was deemed essential for their protection that Keep should retire from the board of directors, and that a new board should be selected by the stockholders to take charge of the management of the company's affairs. It seemed also important that Keep should turn over his Eastern stock to some one, so that it would not be dissipated by him and the credit of the company imperiled on

account of the outstanding bonds of the Clear Lake Company. To this end Keep was entreated by the directors while in jail to make some arrangement whereby the company would be protected, to which he readily and freely assented. This resulted in his entering into a trust arrangement, with power to vote his stock or a large portion thereof, with E. E. Miller, of date March 26, 1913. Under this agreement the board of directors was realigned and Keep's name was omitted.

Under the agreement and by its terms $53,000 of the Eastern bonds were turned over to Miller to be delivered to J. L. Hartman as security for the payment of debts of the Clear Lake Company, in accordance with an understanding had between Keep and Hartman. $89,500 of the Eastern bonds which were then held by different parties as collateral for Keep's debts were, as soon as the debts were paid, to be turned over to Miller, and the remaining $57,500 of such bonds were to be delivered by Keep to Miller within 60 days. The trust agreement was to remain in force for the period of 2 years. In the meantime Miller was given power and authority to conduct and manage the affairs of Keep in such manner as should seem best for his interest.

We are enabled to trace specifically and certainly 80 of these bonds, by a receipt given to Miller by J. L. Hartman, trustee for them, showing that they were delivered to him in exchange for $75,000 of the bonds of the Clear Lake Company held by R. S. Howard, receiver of the Title Guarantee & Trust Company, which Clear Lake bonds it is certified Hartman was to deliver to Miller, to be held by him until all of said bonds had been surrendered and canceled, whereupon the trust deed or mortgage should be satisfied of record.

Miller testifies that it was agreed between Keep and himself that he was to take up all of these Clear Lake bonds as soon as he could get them, and that when they were all assembled they should be canceled, and that he bent his energies towards the accomplishment of that end. Howard talked with Keep many, many times, he says, and Keep gave him to understand all the time that the Clear Lake bonds were to be disposed of. Howard was personally cognizant of the transaction certified by the receipt of Hartman, and he testifies that it was specifically understood with Keep at the time that the exchange of bonds was made that the Clear Lake bonds were to be surrendered for cancellation. The Howard and Hartman transaction marks not the only incident where the exchange of bonds was made. A number of exchanges were consummated, and practically all with the like understanding with Keep that the Clear Lake bonds were to be surrendered for cancellation. The witness Russell E. Sewall is particularly clear on the subject, and gives a memorandum of the names of a number of creditors concerned. Practically all the Clear Lake bonds have been thus turned over through different channels either to Miller or to Hartman, and all with the same understanding respecting their cancellation. Hartman declares that in all cases the Clear Lake bonds were to be cancelled and the mortgage released.

In view of the testimony, there can scarcely be a question that the Clear Lake bonds were to be surrendered for cancellation, and that Keep so understood it and agreed that it should be done; and not

only that, but he actually participated in so assembling the bonds, with representation to the parties consenting to the exchange that they should be retired and canceled. The Clear Lake bonds have been practically all accounted for. Miller secured of them 247; Hartman 34; Morgan has 3, which Hartman gave to Keep to be delivered to Miller, under the understanding with Miller that, when all the bonds were gathered in, they should be canceled; and 12 others are out, supposedly in the hands of one Mills, who is making no claim here for them. This leaves 4 unaccounted for. At any rate, all should be canceled in pursuance of the continued understanding with Keep to that effect. Beyond this, Keep should be estopped to claim otherwise by his express act in undertaking to secure, as he did, the issuance by the Eastern Company of a series of $200,000 first mortgage bonds. These bonds were issued, as he agreed they should be, and he ought not now to be heard or permitted to say or do anything that would subordinate them to any prior incumbrance.

Another question has been brought into the case by reason of the Wapinitia Irrigation Company's having been made a party defendant, with a view to subordinating its property and rights, whatever they are, to the lien of plaintiff's trust deed. The Wapinitia Company has interposed a counterclaim against Keep, charging him with being the instigator and real party in interest in instituting and maintaining the principal suit to foreclose, and with annoying the water users claiming rights and privileges from the Wapinitia Company, and threatening to disturb them in their enjoyment of such rights and privileges. This entails an inquiry touching the organization of the Wapinitia Company, and, incidentally, whether Keep ought to be heard to claim any interest therein.

The Eastern Company acquired, not only the holdings of the Clear Lake Company, but additional holdings from Keep, and all these have been embraced in the trust deed to Bayer to secure the payment of the $200,000 bond issue, which bonds, as we have seen, became the property of Keep. The Wapinitia Company acquired its property and holdings from the Eastern Company. Keep claims that they were so acquired through a fraud upon him committed by Miller by maladministration of his office as trustee for Keep under the trust arrangement of March 26, 1913.

The Eastern Company, in pursuance of a proposition made by W. B. Keen and others to purchase a portion of its properties, rights, and privileges for promoting a separate irrigation project, sold and conveyed to the Wapinitia Company such of its property as was desired. In arranging and perfecting the sale, Miller testifies, in effect, that with an open mind he disclosed to Keep everything that was going on, and consulted and collaborated with him freely at all times touching the Wapinitia project, and that whatever was done looking to the consummation thereof was done with his explicit and unrestrained consent and approval. Keep flatly controverts Miller's statements in almost every material particular, and disclaims any knowledge of the Eastern Company's negotiations with Keen for the sale of the property to the

Wapinitia Company, or of the sale being made, until some time after it had been consummated.

Happily, the documentary evidence contained in the record renders a satisfactory solution of this dispute, without an attempt to reconcile their conflicting statements. On July 20, 1914, Keep wrote the Secretary of the Interior a letter whereby he specifically recognized that certain rights and privileges therein noted were to be transferred to W. B. Keen, or his order. He further released to the government all such rights, and directed and authorized it to make the necessary transfer to Keen. Keep seems to dispute his signature to the letter, but I am persuaded that it is genuine.

On September 30, 1914, J. C. Bayer, trustee, gave a partial release of the Eastern Company's $200,000 mortgage, releasing the lands, rights, and privileges conveyed to the Wapinitia Company from the lien of the trust deed. Before he would consent to execute the release, he exacted of the bondholders of the Eastern Company's issue a request or direction on their part that he do so. In compliance therewith, Keep and the other holders made such request and direction in writing. The one made by Keep bears date September 1, 1914, whereby he represents that he is the owner of 40 of such bonds, and further represents that he understands that a sale has been made to W. B. Keen of a portion of the water rights and privileges theretofore secured from the government and from the state of Oregon, and that in order to make a conveyance to Keen it is necessary to release the property purchased by him from the lien of the trust deed or mortgage held by Bayer. The property to be released is specifically described. The request proceeds:

"Now, therefore, in consideration of one dollar and other good and valuable consideration to me in hand paid, the receipt of which is hereby acknowledged, I hereby consent, authorize, and direct you to release said property conveyed, or to be conveyed, to the said W. B. Keen by the said company from the lien of the trust deed or mortgage, so far as the bonds owned by me are concerned.          [Signed]   Joseph R. Keep."

Other like requests were made by members of his family, of which he was apprised. These documents show beyond question that Keep, not only gave his free assent to the sale being made to Keen, and likewise to the Wapinitia Company, but actually and actively participated in it; and it is now too late, after the Wapinitia Company has become possessed of its rights and privileges, and expended large sums of money to that end, in reliance upon his acts, for Keep to attempt to oust it, or to disturb it or the water users in the enjoyment of their possession.

A decree will be entered dismissing the plaintiff's complaint, and enjoining Keep from disturbing the Wapinitia Company and the water users in the full enjoyment of their property, rights, and privileges.